UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROBERT EARL BOOTH,

    Plaintiff,

v.                                                Case No. 15-C-1253

LORI DOEHLING, SHARON MOERCHEN,
CINDY BARTER, SHARI ,
SUSAN PETERS, WANDA YESKA,
DUSTIN HODGE, and BRIAN MILLER,

    Defendants.

ORDER GRANTING MOTION TO CORRECT BRIEF, GRANTING SUMMARY
JUDGMENT AS TO LORI DOEHLING, CINDY BARTER, SHARI KLENKE, AND
SUSAN PETERS AND
DENYING SUMMARY JUDGMENT AS TO SHARON MOERCHEN,
DUSTIN HODGE, BRIAN MILLER, AND WANDA YESKA

Robert Earl Booth, a Wisconsin state inmate, claims that defendants violated his constitutional rights through their deliberate indifferent to his thumb injury, which that occurred while he was on his prison job. He further asserts that defendant Sharon Moerchen, retaliated against him by misconstruing his work status to his employer, resulting in him being fired from the job. This case is now before the court on defendants' motions for summary judgment. (Docs. 36, 41.)

RELEVANT FACTS[1]

Defendants Lori Doehling, a Health Services Manager; Cindy Barter, a Nurse Clinician II; Shari Klenke, a Nurse Clinician II; Sharon Moerchen, a Nurse Clinician II; Dustin Hodge, a Corrections Officer; Wanda Yeska, a Corrections Food Service Leader; and Brian Miller, a

---

[1] The facts in this section are primarily taken from "Defendant Susan Peters' Reply to Plaintiff's Response to Defendant Peters' Proposed Findings of Fact in Support of Motion for Summary Judgment on Her Behalf" (Doc. 70) and "State Defendants' Replies to Plaintiff's Responses to Defendants' Proposed Findings fo Facts" (Doc. 74). The facts are undisputed unless otherwise noted.

Corrections Unit Supervisor, were employed by the Wisconsin Department of Corrections at the Redgranite Correctional Institution at all relevant times. Susan Peters, an advanced practice nurse prescriber, worked at Redgranite but was employed by Maxim Healthcare Services.

Plaintiff worked as a dish washer in food services at Redgranite from June 22, 2014, until March 1, 2015, and was supervised by Yeska. According to Yeska, on August 30, 2014, plaintiff showed her his left thumb and said it was hurt while cleaning the dishwasher. Yeska states plaintiff did not say he was in pain or request medical attention. Hodge adds that he spoke with plaintiff on August 30 about a thumb injury. Plaintiff, on the other hand, states he told Yeska and Hodge that he felt a sharp and intense pain when he hurt his thumb and that his hand went numb. He maintains that he requested medical attention.

Yeska submits that she allowed plaintiff to return to his housing unit without finishing his shift; however, plaintiff states that Yeska and Hodge advised him that they would get medical help. Shortly thereafter, when plaintiff asked Yeska and Hodge about going to the health services unit (HSU), they said no one was there and sent him and other inmates back to their unit.

Plaintiff states that upon returning to the housing unit he informed Miller that his thumb required medical attention because he was in a lot of pain, but that Miller did nothing to assist. Miller does not recall plaintiff complaining about needing medical care for a thumb injury and explains that his standard practice was to inform inmates that they could submit a health services request for non-emergency injuries. Afterward, he would contact HSU or ensure that HSU was notified by unit staff. However, Miller did not contact HSU about plaintiff's thumb injury.

The next day, August 31, 2014, plaintiff returned to work and told Hodge that he was still in pain and needed medical attention. Hodge then contacted HSU and sent plaintiff there.

The HSU triage nurse noted that plaintiff had swelling, and range of motion limitations in his hand. She gave him ice, pain medication, and a splint. Moreover, the triage nurse placed plaintiff on a one-week work restriction and scheduled him to see an advanced practice nurse prescriber. In Wisconsin, an advanced practice nurse prescriber has a certificate that allows the holder to issue prescription orders. An advanced practice nurse may also serve as a primary care provider and perform duties that are similar to those of doctors.

On September 3, plaintiff was seen by Moerchen for a follow-up and continued to complain of pain. Moerchen placed his thumb in a spica splint and advised plaintiff to elevate his hand to reduce the swelling and throbbing. She also told him to take pain medication and to ice the injury three to four times each day.

Moerchen determined that plaintiff should be seen by an advanced care provider, so later that day he was seen by Peters, an advanced practice nurse prescriber. Peters's assessment and plan were as follows:

> Traumatic injury to left hand: thumb Spica cast placed per nursing triage. Continue with ibuprofen, ice and elevation. X-ray of left hand and him to be obtained. Further recommendations will be based upon x-ray findings.

(Doc. 70 at 13.)

The next day, September 4, 2014, plaintiff underwent x-rays of his left fingers and left hand. The x-ray films were evaluated that day by a radiologist who concluded there was "No acute pathology." (Doc. 70 at 16.) Peters reviewed the radiologist's report on September 5, 2014, in addition to reassessing and reevaluating plaintiff's injury. Her notes indicate:

> Traumatic injury to left hand: thumb Spica cast has been removed. X-ray findings of [9/04/14] have been reviewed with Robert. First metacarpal has a deformity most consistent with prior fracture. Soft tissues are within normal limits. There is mild degenerative changes [sic] consistent with mild degenerative changes and narrowing of the interphalangeal joint spaces. Symptomatic treatment will continue with heat, nonsterodial medication and he will be off of work for 3 weeks. If he feels he is unable to perform his activities of occupation he will contact Hsu.

(Doc. 70 at 20.)

Peters asserts that, based on the appearance of the x-rays, plaintiff suffered from a fracture to the first joint of his left thumb many months, if not years, prior and that the x-ray images of the soft tissue did not demonstrate swelling. During her September 5 examination, Peters noted that plaintiff's thumb joint was bruised.

Plaintiff disputes much of Peters's assessment and contends it was based only on her review of the triage nurse's examination notes and a visual inspection of his thumb and not a a physical examination. He asserts that he explained to Peters that he did not have a prior fracture to his left hand or thumb. Additionally, plaintiff highlights that the triage nurse noted swelling during her examination.

Peters diagnosed plaintiff with a contusion of the left thumb in the area of an old fracture and concluded that he had no serious medical need related to the August 30 work injury. She also found that he had chronic, mild degenerative changes from the old fracture, including a narrowing of the interphalangeal joint spaces. Based on her findings, Peters determined that it was no longer medically necessary for plaintiff to possess the spica cast and recommended continued treatment of heat, nonsteroidal medication and a no-work restriction for three weeks.

Plaintiff asserts he informed Peters that he was in extreme pain and that the ibuprofen was not working. He adds that Peters said there was nothing else she could do and that he should contact HSU for further follow-up if he was unable to perform his work functions. On the

4

other hand, Peters maintains that she was not aware that plaintiff had further complaints concerning his hand injury until she was served in this lawsuit.

On September 6, 2014, Barter directed plaintiff to return the spica cast to HSU, and he did so that day. Plaintiff's no-work restriction expired on September 26, and he returned to work. Advanced practice nurse prescriber Frank (who is not a defendant) saw plaintiff on November 10, 2014, based on his complaints that his left thumb pain continued and that he had decreased mobility and grip strength that made it difficult for him to perform his kitchen job duties. Frank suspected that plaintiff had postraumatic osteoarthritis and ordered x-rays. He also prescribed lidocaine cream to use for pain control.

On November 13, 2014, a second x-ray of plaintiff's hand was taken. The x-ray showed moderate left first metacarpal phalangeal joint osteoarthritis. The x-ray did not show an acute fracture or osseous deformity; the soft tissue was also unremarkable. After discussing treatment options with Frank, plaintiff elected to try capsaicin cream for a few weeks and if that was unsuccessful he would consider a cortisone injection into the joint.

On January 22, 2015, a nurse (who is not a defendant) placed plaintiff on a no-work restriction through March 15, 2015. Defendants contend that such a lengthy no-work restriction is contrary to the practice of HSU, as nurses are authorized to give inmates restrictions for only up to thirty days. Defendants explain that inmates can lose their jobs if they are off work more than thirty days. However, in certain circumstances, advanced care providers may place an inmate on a work restriction for longer than thirty days.

On February 16, 2015, Moerchen released plaintiff from his no-work restriction because its length was contrary to policy. Plaintiff contends that she removed the restriction arbitrarily, without checking whether he could perform his work functions and without consulting with Frank. He also asserts that the nurse who gave him the fifty-two day no-work restriction did so

5

based on Frank's January 12, 2015 order that indicated a follow-up appointment was necessary.

Defendants explain that because plaintiff no longer had a work restriction he could return to work or follow the policy regarding medical lay-in status. (Neither party explains the practical differences between a no-work restriction and medical lay-in status or why one might be preferred to the other.) It is unclear whether plaintiff returned to work after Moerchen removed his no-work restriction.

On February 27, 2015, plaintiff had an appointment with Dr. Lisa Allen (who is not a defendant). Allen changed plaintiff's medical classification to "no work status" and requested an off-site consultation with an orthopedic doctor.

The next day, according to defendants, food-service staff contacted HSU inquiring about plaintiff's work status. Moerchen responded that Allen had changed plaintiff's medical classification to "no work status."

Plaintiff disputes that food-services staff contacted Moerchen. Instead, he submits that Moerchen told him that she contacted food services. Plaintiff explains that Allen did not mean that plaintiff could not work, nor did she intend for him to lose his job. Instead, according to plaintiff, Allen's decision to place him on "no work status" meant only that he should not work until he could be examined by an orthopedic specialist. It is plaintiff's view that Moerchen overstated or intentionally misconstrued Allen's decision and told food services that he could no longer work. He argues that she did so because he complained previously that she had removed the no-work restriction given to him by another nurse. It was after Moerchen's communication with food services that plaintiff lost his job.

Allen's request for plaintiff to see an orthopedic specialist was approved on March 2, 2015, and an appointment was scheduled for April 7, 2015. During the appointment, the doctor

noted: "Thumb MCP joint injury – old now w/ sequelae [after effects]. Initial injury likely resulted in radial collateral ligament rupture as well as a dorsal capsular avulsion." (Doc. 45-1 at 31.) (The record is unclear whether the doctor's citation to the "initial injury" refers to the August 30 injury or to a prior injury. Plaintiff denies that he suffered a hand injury prior to August 30.) The doctor recommended that plaintiff start with a splint to reduce motion across the joint, thereby reducing pain. He informed plaintiff that if he did not feel relief he could follow-up in six weeks for a cortisone injection.

On May 19, 2015, plaintiff had another appointment. The pain had not improved with use of the splint, so, after discussing the options with the doctor, plaintiff elected to proceed with surgery to fuse the metacarpal joint of his left thumb. The surgery was scheduled for July 6, 2015.

Defendants assert that between May 19, 2015, and the scheduled surgery, plaintiff continued to receive care, including prescriptions for Naproxen and Tramadol to address his pain. Plaintiff disputes this assertion and maintains he complained about severe pain on several occasions and was given the same ineffective treatment that did nothing to address his pain.

On June 5, 2015, plaintiff had a follow-up appointment with Moerchen. Plaintiff asserts that rather than examining his thumb during this appointment, she questioned him regarding why he had filed complaints against her. Moerchen disagrees and states that she was not informed that plaintiff had made complaints against her and that she was not contacted by the institution complaint examiner concerning any complaints made by plaintiff.

On July 6, 2015, plaintiff had his first metacarpal joint fusion surgery. His doctor prescribed him forty Norco pills, one to two of which should be taken every four hours as needed. Defendants assert that plaintiff took all forty pills, after which Dr. Holzmacher (who is

7

not a defendant) prescribed 600 mg of ibuprofen, three times a day as needed for thirty days. Plaintiff submits that he received only twenty-eight of the pills and that ibuprofen was ineffective and made him sick. Defendants did not respond to his assertion that twelve pills were missing.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

A.   Deliberate Indifference to a Serious Medical Need

Prison officials violate the Constitution's "proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). The standard contains both an objective element (that the medical need be sufficiently serious) and a subjective element (that the officials act with a sufficiently culpable state of mind). *Id.; Chavez v. Cady,* 207 F.3d 901, 905 (7th Cir. 2000).

To qualify as a "serious" medical condition under the objective prong, the condition must be "one that a physician has diagnosed as needing treatment or that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009).

Establishing deliberate indifference under the subjective prong is a high standard; medical malpractice is insufficient, as is a mere disagreement with a medical professional's medical judgment. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). "A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, 'no minimally competent professional would have so responded under those circumstances.'" *Arnett*, 658 F.3d at 751 (*quoting Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)).

1. Defendants Yeska, Hodge, and Miller

Yeska, Hodge, and Miller argue that plaintiff's deliberate indifference claim against them fails under both prongs of the standard. With regard to the objective prong, they argue that plaintiff's thumb injury was not a serious medical need at the time of their involvement. These defendants cite cases where courts found that inmates with a swollen cheek, split lip, swollen ankle, or wrist abrasions did not present an objectively serious need. (Doc. 42 at 11 (citations

9

omitted)). They also assert that conditions that are treated only with common over-the-counter medications are not objectively serious. (*Id.* (citations omitted)). Yeska, Hodge and Miller highlight that at the time of their involvement, plaintiff presented with a swollen thumb, for which he was prescribed only rest, ice, and ibuprofen.

The court cannot conclude on this record that plaintiff's thumb injury was not sufficiently serious to satisfy the objective prong. "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). Here, plaintiff asserts that he was in extreme pain, that his hand went numb, and that he had to undergo surgery to fuse his thumb joint. The orthopedic doctor who examined plaintiff in April 2015 determined that the "initial injury likely resulted in radial collateral ligament rupture as well as dorsal capsular avulsion."[2] (Doc. 45-1 at 31.) Such an injury is far more significant than "sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue." *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey,* 97 F.3d 914, 916 (7th Cir. 1996)). Consequently, the court finds that plaintiff's injury was sufficiently serious to satisfy the objective prong.

With regard to the subjective prong, plaintiff asserts that he complained immediately to Yeska and Hodge that he had slammed his thumb in the dishwasher and was in a lot of pain. He maintains that he asked for medical help and they agreed to get it. After a few minutes, with the pain worsening, plaintiff states he approached them again, but this time these defendants

---

[2] As previously noted, it is unclear to the court whether the doctor's citation to the "initial injury" was referring to the August 30 injury or some prior injury; however, because at this stage the court is to construe all inferences in favor of the non-moving party, the court will assume the former.

told him there was no one at HSU and sent him back to his cell. Hodge submits that plaintiff did not approach him about his injury until the next day, at which time he contacted HSU immediately. On the other hand, Yeska asserts that plaintiff informed her only that he had hurt his thumb and did not say he was in pain or needed medical care.

"Prison [officials] have a responsibility for prisoners' welfare. If a prisoner is writhing in agony, the [prison official] cannot ignore him on the ground of not being a doctor; he has to make an effort to find a doctor . . . or a technician, or a pharmacist—*some* medical professional." *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015). According to plaintiff, because neither Hodge nor Yeska made any effort to get him medical help, he was forced to go an entire night without pain relief, ice, or other treatment for his injury. If a jury were to credit plaintiff's version of the events, it could reasonably conclude that these defendants' failure to help plaintiff get medical treatment constituted deliberate indifference to his serious medical need.

Plaintiff further states that he complained to Miller, the correctional guard on his unit, that he was in a lot of pain and needed medical attention, but Miller did nothing. He asserts that as a result of Miller's alleged refusal to help him get medical care, he had to endure extreme pain for the night without any treatment for his injury. However, as noted above, Miller does not remember plaintiff complaining about his thumb injury on August 30— and only references his standard practice when inmates complain about injuries. Based on this record, a jury could reasonably conclude that Miller was deliberately indifferent to plaintiff's serious medical need.

Yeska, Hodge, and Miller also argue that they are entitled to qualified immunity on plaintiff's claims. They are not. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Determining whether a state official is

entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago,* 733 F.3d 749, 758 (7th Cir. 2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

The court has already determined that a jury could reasonably conclude that these defendants violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment when they failed to assist him in obtaining medical treatment for his thumb injury. Additionally, the court finds that this right—not to be ignored by prison officials when suffering from a serious injury—as clearly established at the time of the violation plaintiff alleges here. Therefore, the court must deny summary judgment as to defendants Hodge, Yeska, and Miller.

2.  Defendant Peters

Having already decided that plaintiff satisfies the objective prong of the deliberate indifference standard, the court will focus only on whether a reasonable jury could conclude that Peters was deliberately indifferent to plaintiff's serious medical need. The court concludes that it could not.

The parties agree that plaintiff had appointments with Peters on September 3 and 5. At the September 3 appointment, Peters ordered x-rays to further evaluate plaintiff's injury. She also continued the pain medication and ice prescribed by the triage nurse. Two days later, Peters reviewed the findings of the radiologist, diagnosed a contusion, and gave plaintiff a three-week no-work restriction to allow the contusion to heal without further aggravation. Plaintiff did not have any contact with Peters regarding his thumb injury after September 5. Hence, no jury could reasonably conclude that Peters' prompt and thorough treatment demonstrated deliberate indifference to his injury.

Notably, plaintiff emphasizes that Peters ordered the removal of the spica splint, which he argues further aggravated his injury. However, Peters's decision to remove the splint was based on her determination that it was no longer medically necessary. Thus, the heart of his claim against Peters is a disagreement about the proper course of treatment, which is insufficient to overcome summary judgment. To defeat summary judgment, plaintiff needed to present evidence that Peters's decision was so significant a departure from accepted professional standards or practices that it is questionable whether she actually exercised professional judgment. *See Arnett,* 658 F.3d at 751. Plaintiff failed to do so. For these reasons Peters is entitled to summary judgment.

3. Defendant Barter

Next, plaintiff argues that Barter demonstrated deliberate indifference to his thumb injury by ordering him to return his thumb splint to HSU and to return to work without examining him. However, the court is persuaded that plaintiff mischaracterizes what actually occurred. As already noted, on September 5 plaintiff had an appointment with Peters, who determined that his spica splint was not medically necessary. Barter had no role in that decision. Moreover, Peters gave plaintiff a no-work restriction for three weeks with instructions to plaintiff that he should inform HSU if his injury required additional time off.

The day after Peters's assessment, Barter entered an order requiring plaintiff to return his thumb splint. She also entered a three-week no-work restriction which was set to expire on September 26, 2014. These actions were based on Peters's orders and the facts before the court do not suggest that the orders were likely to harm plaintiff or that it was inappropriate for Barter to defer to those orders. *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). Therefore, this court finds that no jury could reasonably conclude that Barter was deliberately

indifferent to plaintiff's injury by carrying out the treating provider's orders upon which she acted. Hence, Barter's motion for summary judgment will be granted.

4. Defendants Doehling and Klenke

Title 42 U.S.C. § 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless she caused or participated in an alleged unconstitutional deprivation of rights. *Zentmeyer v. Kendall Cnty.*, 220 F.3d 805, 811 (7th Cir. 2000). Here, Klenke and Doehling's involvement in the constitutional violations claimed was limited to responding to plaintiff's health service requests about other medical staff's decisions. These individuals did not examine plaintiff or interact with him regarding his complaints of pain, nor did they make any decisions respecting his treatment plan. Because they were not personally involved in the alleged unconstitutional deprivation of plaintiff's rights, they are entitled to summary judgment in their favor.

5. Defendant Moerchen

Plaintiff argues that Moerchen was deliberately indifferent to his serious medical need because she ended a lengthy no-work restriction that was entered by another nurse and denied him prescribed pain medication. However, Moerchen maintains that she was simply enforcing DOC policy when she removed plaintiff from the no-work restriction. She explains that the restriction was too long under the policy and, had she not removed the restriction, plaintiff could have lost his job. She adds that plaintiff finished forty of his pills and that the ibuprofen she gave him thereafter was pursuant to a doctor's orders.

On these facts, the court finds that no jury could conclude that Moerchen's decision to end plaintiff's lengthy no-work restriction without examining him or consulting with his advanced practice nurse (Frank) demonstrated deliberate indifference to plaintiff's thumb injury. The

record shows that Moerchen was simply enforcing the HSU policy, which prohibits nurses from entering no-work restrictions for longer than thirty days.

While advanced care nurses can enter no-work restrictions for longer than thirty days, plaintiff sets forth no evidence that Frank (or any other advanced care nurse) entered such a restriction, nor does he set forth any evidence that the nurse who entered the no-work restriction did so on the orders of an advanced care nurse. In other words, Moerchen was not intentionally interfering with a sanctioned medical determination that plaintiff needed a nearly two-month no-work restriction; she was merely correcting a colleague's error that was inconsistent with institution policy.

Additionally, even though Moerchen canceled the no-work restriction, she notified plaintiff of the institution's lay-in policy. This policy would have allowed plaintiff to stay off of work in the event he did not think he could perform his job duties. As such, Moerchen did not "force" plaintiff back to work, as plaintiff claims. Instead, she only ensured that plaintiff's decision not to work was consistent with the applicable policy. It follows that Moerchen is entitled to summary judgment on this aspect of plaintiff's claim.

On the other hand, Moerchen is not entitled to summary judgment on plaintiff's claim that she denied him twelve of his prescribed forty pain pills. Plaintiff asserts that right after undergoing surgery to fuse his thumb joint, he was in a lot of pain and needed medication stronger than the ibuprofen, which, prior to surgery, had proven to be ineffective in treating his pain. When he explained this to Moerchen, he had six doses left, at a minimum (assuming he took two pills each time), yet she did nothing to investigate why so many doses were missing. Instead, she secured a prescription from another doctor for pain medication that plaintiff had on many occasions said was ineffective.

Moerchen does not address plaintiff's statements that he told her he was missing pills and that the prescribed ibuprofen was not an adequate substitute. For this reason, the court finds that a jury could conclude that her failure to provide plaintiff with the prescribed pain relief and her failure to investigate plaintiff's claims that he received only a portion of the prescribed pain relief constituted deliberate indifference to his serious medical condition. For this reason, the court will deny Moerchen's motion for summary judgment respecting plaintiff's claim that she denied him medically necessary pain medication.

Finally, plaintiff alleges that Moerchen retaliated against him by contacting his employer saying that he had been moved to no-work status thereby causing him to lose his job. Plaintiff states that Moerchen intentionally misconstrued his classification, which the doctor intended to apply only until plaintiff could be seen by an orthopedic specialist (similar to when Peters placed him on a no-work restriction for three weeks after the initial injury). He explains that Moerchen took this action because he had filed complaints about her decision to end the no-work restriction he had received from another nurse. Plaintiff asserts that Moerchen told him that she had contacted his employer and that she repeatedly questioned him about his decision to complain about her.

According to Moerchen, plaintiff's employer contacted her concerning his status and she merely responded to the inquiry. She states that she did not know plaintiff had made complaints about her, and could not have questioned plaintiff about why he filed them.

Although it is easy to state a retaliation claim, the burden of proving the claim is heavy. *Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996). To prevail on a First Amendment retaliation claim, an inmate must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter a person from engaging in the First Amendment activity in the future; and (3) facts make it plausible to infer that the First

Amendment activity was a motivating factor of defendant's decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009). If the inmate meets all three elements, the burden shifts to the defendant to show that she would have taken the same actions "even in the absence of protected conduct." *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011). In other words, a defendant will not be found to have retaliated against an inmate if she can show that the alleged retaliatory act "would have occurred anyway." *Id.* at 980.

Moerchen concedes that plaintiff sets forth evidence satisfying the first two prongs; however, she disputes that he has presented any facts that make it plausible that she carried out a retaliatory act or that, even if her actions could be construed as retaliatory, that she would not have taken the same action absent the protected conduct. The court agrees.

The problem with the plaintiff's argument is that plaintiff's doctor *did* change his medical classification to "no work status." That decision differed from the other nurse's and Peters's decisions to place plaintiff on a "no-work restriction." (*Compare* Doc. 45-1 at 21 with Doc. 45-1 at 11, 17.) Contrary to plaintiff's position, a review of the doctor's order reveals no indication that she intended her classification to be temporary. (Doc. 45-1 at 21.) The change in the classification order states: "No Work Status - Offender is unable to work." (*Id.*) This stands in stark contrast to the two prior restriction orders, which expressly state the start and end dates during which plaintiff was to be excused from work. (Doc. 45-1 at 11, 17.)

Thus, even if Moerchen did contact plaintiff's employer to inform them of his change in classification, she did nothing more than communicate the doctor's order as written. Plaintiff was not entitled to keep that information from his employer and Moerchen's decision to relay that decision to plaintiff's employer did not violate his constitutional rights. Hence, the court will grant Moerchen's motion for summary judgment on this claim.

17

Like Yeska, Hodge, and Miller, Moerchen argues that she is entitled to qualified immunity. Her argument fails for the same reason theirs did: the court has determined that a jury could reasonably conclude that she violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment when she failed to give him his prescribed pain relief despite his numerous complaints and requests for it. This right—to receive prescribed pain relief— was clearly established at the time of the events at issue.

In view of the matters discussed above,

IT IS ORDERED that plaintiff's motion to correct his brief is granted. (Doc. 69.)

IT IS FURTHER ORDERED that defendant Susan Peters' motion for summary judgment is granted. (Doc. 36)

IT IS FURTHER ORDERED that defendants Cindy Barter, Lori Doehling, Dustin Hodge, Shari Klenke, Brian Miller, Sharon Moerchen, and Wanda Yeska's motion for summary judgment is granted as to Barter, Doehling, and Klenke, and denied as to Hodge, Miller, Moerchen, and Yeska. (Doc. 41.)

The court will attempt to recruit counsel to represent plaintiff on his surviving claims. Once counsel is located, the court will arrange a scheduling hearing with the parties to set a date for trial.

Dated at Milwaukee, Wisconsin, this 20th day of January, 2017.

BY THE COURT

s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U.S. District Judge